Present: Carrico, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ.

WILLIAM JOSEPH BURNS

OPINION BY
v. Record Nos. 001879 & 001880    JUSTICE CYNTHIA D. KINSER
                                        March 2, 2001
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SHENANDOAH COUNTY
Dennis Lee Hupp, Judge

A jury convicted William Joseph Burns of the capital
murder of Tersey Elizabeth Cooley in the commission of rape
and/or forcible sodomy in violation of Code § 18.2-31,
statutory burglary in violation of Code § 18.2-90, rape in
violation of Code § 18.2-61, and forcible sodomy (anal
intercourse) in violation of Code § 18.2-67.1.[1]  At the
conclusion of the penalty phase of a bifurcated trial, the
jury recommended that Burns be sentenced to death on the
capital murder conviction, finding that "there is a
probability that [Burns] would commit criminal acts of
violence that would constitute a continuing serious threat to
society" and that his conduct in committing the offense was
"outrageously or wantonly vile, horrible or inhuman in that
it involved torture, depravity of mind or aggravated battery
to the victim beyond the minimum necessary to accomplish the
act of murder."  The jury also sentenced Burns to 18 years on

the statutory burglary conviction, and to life imprisonment on each of the convictions for rape and forcible sodomy. After reviewing the post-sentence report required by Code § 19.2-264.5, the trial court sentenced the defendant in accordance with the jury verdicts.

Burns appealed his non-capital convictions to the Court of Appeals pursuant to Code § 17.1-406. We certified that appeal (Record No. 001880) to this Court under the provisions of Code § 17.1-409 for consolidation with the defendant's appeal of his capital murder conviction (Record No. 001879) and the sentence review mandated by Code § 17.1-313. After considering Burns' assignments of error, the record, and argument of counsel, we find no error and will affirm the judgments of the circuit court.

## I.  FACTS

Applying familiar principles of appellate review, we will recite the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party before the circuit court.[2]  Johnson v. Commonwealth, 259 Va. 654, 662, 529 S.E.2d 769, 773, cert. denied, ___ U.S. ___, 121

_____

[1] The jury found Burns not guilty of forcible sodomy (fellatio). The circuit court granted Burns' motion to strike the evidence with regard to a charge of robbery.

[2] Some of the facts and material proceedings will be summarized when addressing specific assignments of error.

S.Ct. 432 (2000); Walker v. Commonwealth, 258 Va. 54, 60, 515 S.E.2d 565, 568 (1999), cert. denied, 528 U.S. 1125 (2000). We also accord that evidence all inferences fairly deducible from it. Horton v. Commonwealth, 255 Va. 606, 608, 499 S.E.2d 258, 259 (1998) (citing Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)).

### A. GUILT PHASE

During the day on September 20, 1998, Burns was drinking heavily at his trailer in Baker, West Virginia. He resided there with his wife, Penny Marlene Cooley Burns, and her two sons. Apparently some home repairs were not going well, and Burns became increasingly angry with his wife. Because Burns had previously assaulted and battered Penny on several occasions when he was drinking, she became concerned for her safety and decided to leave their residence. She had left Burns once before when he was drinking. On that occasion, Penny went to her mother's house in Edinburg, Virginia, and stayed there a few days before returning home.[3]

When Penny left her home on September 20th, she did not go to her mother's home. Instead, she took a circuitous route unfamiliar to Burns to the home of her friends, Amanda

---

[3] Penny's mother was Tersey Elizabeth Cooley, the victim in this case.

and Leonard Funkhouser.[4]  On the way to their house, Penny stopped several times to telephone her mother.  Penny wanted her mother to know that Penny had left Burns and would be staying at the Funkhousers' house.  Penny also wanted to warn her mother not to let Burns into Cooley's home if he came there.[5]  However, Penny was never able to reach her mother, even after she arrived at the Funkhousers' residence.

Around midnight, Burns showed up at the Funkhousers' house and asked Penny to go home with him.  She refused.  Burns then left but returned about an hour later.  He remained outside the Funkhousers' home in his car until the next morning.  When the Funkhousers left for work that morning, they did not want to leave Penny alone in their home.  So, Leonard took Penny to work with him.  At Leonard's suggestion, Penny then went on a commercial truck run to Ohio and Pennsylvania with a friend of Leonard's.  While in Pennsylvania, Penny learned about her mother's murder during a telephone conversation with Penny's son.

Around noon on September 21, 1998, Penny's sister, Linda Yvonne Heres, went to the home of her 73-year old mother.

---

[4] The Funkhousers lived in Fort Valley, Virginia, which is about a 45-minute drive from Cooley's house in Edinburg.

[5] According to Penny, when she left Burns the first time, he threatened to kill her or her mother if she ever left him again.

4

When Linda arrived at Cooley's home, she discovered that the screen on the kitchen door had been pushed in, and she later realized that a window pane in the kitchen door had been broken. After Linda entered the house, she yelled for her mother but heard no response. Linda then proceeded into her mother's bedroom and found her mother's unclothed, dead body lying on the floor.[6] Cooley's face was partially covered by a mattress that had been pulled from the bed, and her lower dentures were lying on the floor about four feet from her jaw. The bedroom was in disarray, and the bedclothes were scattered around the room.

Frances Patricia Field, Assistant Chief Medical Examiner for the Northern Virginia District Medical Examiner's Office, performed an autopsy on Cooley's body. Dr. Field reported that Cooley had "multiple injuries about the head," including abrasions and bruises on the right forehead; beside the right eyebrow; on the white part of the eyeball; on the right and left jaw lines; on the neck; and on the right cheek, chin, and mouth. Cooley also had large bruises on her upper chest and lower neck. Cooley's inner lips were likewise bruised, and Dr. Field testified that the injuries to Cooley's gums and lips were consistent with her dentures having been in

_____

[6] Cooley had on only a bra when Linda found her body.

5

place at the time of the assault.  Finally, Cooley sustained 24 fractures to her ribs.

Dr. Field determined that the cause of death was "blunt force trauma to [Cooley's] chest, with rupture of the heart" and compression of the neck.  There was also a tearing of Cooley's pericardium, causing blood to spill out of the heart into the chest cavity.  Dr. Field opined that a broken rib probably had punctured the heart, although direct force applied to the chest might have ruptured the heart.  Because bleeding is rapid when the heart is ruptured, Dr. Field concluded that death occurred within two to three minutes after Cooley's heart ruptured.

After Linda found her mother's body, she called "911." Soon thereafter, the police and rescue squad arrived at the scene.  Larry W. Green, Sheriff of Shenandoah County, subsequently decided to set up a "traffic-canvassing detail" to ascertain if any drivers had traveled through the area where Cooley's house was located between approximately 7:00 p.m. on September 20th and 11:30 a.m. on September 21st.  As Sheriff Green was moving a flare on the roadway south of the Cooley residence, a vehicle approached him.  Sheriff Green testified that he "was in the center of the road, walking with the flare, and, of course, that stopped the car, and [he] approached the driver's side."  Burns was operating that

6

vehicle. After Burns stopped and before Sheriff Green could say anything, Burns asked, "What's going on? That's my mother-in-law's house." Upon realizing that Burns was a relative of the decedent, Sheriff Green asked him to speak with Garlan Gochenour, a lieutenant with the Shenandoah County Sheriff's Office, who would explain what had happened.

Burns then walked over to a nearby police cruiser and got into the right front seat as Gochenour got into the left front seat. Gochenour informed Burns about Cooley's death and then advised Burns of his Miranda rights. Burns told Gochenour that he had not been in the victim's house within the last five days or within the last year. However, Burns admitted that he had driven by Cooley's home on September 21st between 1:00 a.m. and 1:30 a.m., but insisted that he had merely turned around in the driveway and then proceeded to the Funkhouser residence.

Upon realizing that Burns had been at the crime scene during the approximate time when the murder occurred, Gochenour asked Burns to go to the sheriff's department to be fingerprinted. Burns agreed and drove his own vehicle to the sheriff's department, where he later was fingerprinted. While at the sheriff's office, Gochenour again advised Burns of his Miranda rights, and during subsequent questioning, Burns stated that he had been at a gas station near Cooley's

7

residence at approximately 2:52 a.m. and again at approximately 6:35 a.m. on September 21st. In fact, Burns subsequently produced receipts for items that he had purchased at the station, and explained that he kept the receipts because he was on probation and needed to account for every place that he went. Gochenour also talked with Burns about a Physical Evidence Recovery Kit (PERK Kit), and Burns agreed to go to the hospital so that samples of his hair and bodily fluids could be obtained for the PERK Kit. Gochenour and John Thomas, an investigator with the Shenandoah County Sheriff's Office, accompanied Burns to the hospital, where the samples were taken.

On September 26th, Burns returned to the sheriff's office. After advising Burns of his Miranda rights, Gochenour interviewed him again. This time, Burns admitted that he was in the victim's home on the night of the murder. Burns stated that, when he entered the house, he encountered a black male who had already murdered Cooley. According to Burns, he killed that man and disposed of the body because Burns did not want his wife to find out that a black man had raped and murdered her mother. Burns further stated that, in order to advance his cover-up, he cleaned Cooley's vaginal area with soap and water, masturbated, digitally inserted his semen into Cooley's vagina, and "smeared it on the bed."

8

However, Burns specifically denied inserting his semen into the victim's anus.  At the conclusion of this interview, Burns was arrested.

At Burns' request, Gochenour again spoke with him on September 27th.  After Gochenour informed Burns of his Miranda rights, Burns admitted that he had not encountered an unidentified black man at Cooley's house on the night of her murder.  Instead, Burns admitted that he broke into Cooley's house by putting his hand through the screen and then breaking a window pane in the door.  However, Burns insisted that Cooley was already dead when he broke in.  Burns stated that, because he thought his wife, Penny, had murdered her mother, he decided that he wanted "the crime to lead to [him]."  So, he masturbated and digitally inserted his semen into the victim.

Karolyn Leclaire Tontarski, a forensic scientist employed by the Commonwealth of Virginia Department of Criminal Justice Services Division of Forensic Science, analyzed the physical evidence collected from Burns, Cooley, and the crime scene.  Tontarski reported the presence of spermatozoa on vaginal and anal smears taken from the victim. Based upon DNA typing results, Tontarski testified that the sperm fraction found in the vaginal swab was 1.6 million times more likely to have come from Burns than from any other

randomly chosen Caucasian individual, 100 million times more likely in the Black population, and 18 million times more likely in the Hispanic population. According to Tontarski, the sperm fraction in the anal swab was 8.7 million times more likely to have originated from Burns than from any other randomly selected Caucasian individual, 540 million times more likely in the Black population, and 86 million times more likely in the Hispanic population. Tontarski also found sperm cells on a sheet and pillowcase recovered from the bedroom where Cooley's body was discovered, on Cooley's lower denture found on the floor of the bedroom, on a washcloth found under Cooley's left thigh, and on several items recovered from Cooley's bathroom.

## B. PENALTY PHASE

At the penalty phase of the trial, the Commonwealth presented evidence primarily with regard to the issue of Burns' future dangerousness. To establish that predicate, the Commonwealth introduced Burns' prior convictions for felony theft, breaking and entering, malicious destruction of property, resisting arrest, battery, assault, disorderly conduct, and a third-degree sex offense.

In addition, Hazel Buckley, Burns' ex-girlfriend, testified that Burns had anally raped her nine times during a two-week period. Buckley stated that she did not report

those incidents to the police because Burns had threatened her and her daughter.

Burns offered evidence in mitigation of his offense. Members of his family testified regarding the abuse that Burns suffered as a child, primarily from his father who was an alcoholic. They also indicated that Burns did not do well in school. A former inmate testified that Burns had been a "peacemaker" when they were in jail together. Similarly, a shift supervisor at the Shenandoah County Jail testified that Burns was respectful and that Burns had never become violent during his incarceration there.

## II. ANALYSIS

### A. ASSIGNMENTS OF ERROR WAIVED OR DEFAULTED

Burns filed 46 separate assignments of error, which he has reduced to 26 questions presented on appeal. However, Burns failed to brief several of his assignments of error. Consequently, they are waived, and we will not consider them on appeal. Kasi v. Commonwealth, 256 Va. 407, 413, 508 S.E.2d 57, 60 (1998), cert. denied, 527 U.S. 1038 (1999), (citing Jenkins v. Commonwealth, 244 Va. 445, 451, 423 S.E.2d 360, 364 (1992), cert. denied, 507 U.S. 1036 (1993)).[7]

---

[7] Burns failed to brief the following assignments of error:
No. 2: trial court erred in denying defendant's motion to make ex parte applications to the court;

11

No. 4: trial court erred in denying defendant's motion for the appointment of a DNA expert, forensic pathologist, and forensic scientist;

No. 5: trial court erred in appointing a mental health expert under Code § 19.2-264.3:1 rather than under Ake v. Oklahoma, 470 U.S. 68 (1985);

No. 6: trial court erred in denying defendant's motion for a bill of particulars regarding the aggravating factors on which the Commonwealth intended to rely in the penalty phase of the trial;

No. 14: trial court erred in denying defendant's motion for additional peremptory strikes;

No. 15: trial court erred in denying defendant's motion for individual, sequestered voir dire;

No. 21(c-h): trial court erred in failing to strike for cause jurors Buchanon, Dellinger, Kruska, Kisamore, Showman, and Lin;

No. 26: trial court erred in refusing to declare a mistrial based on questions the court asked Penny Burns concerning threats made by defendant;

No. 30: trial court erred in denying defendant's motion for a mistrial based on the hearsay testimony of Pam Cooley concerning a threat made by defendant to kill Penny Burns;

No. 31: trial court erred in limiting cross examination of the forensic scientist, Tontarski;

No. 33: trial court erred in admitting into evidence testimony from Dr. Field that her findings were consistent with intercourse in the vagina and anus;

No. 34: trial court erred in instructing the jurors that they "may infer that a person intends the natural and probable consequences of his acts," as contained in Instruction No. 6;

No. 35: trial court erred in allowing members of the victim's family to remain in the courtroom during closing argument at the guilt phase even though several of those family members were called as witnesses during the penalty phase; and,

No. 36: trial court erred in denying defendant's motion for a mistrial when the Commonwealth's Attorney, during closing argument, misstated Instruction No. 6 by saying that it created a "presumption" and by arguing that defendant was a future danger during the guilt phase.

Burns' attempt to save these assignments of error by relying on his arguments contained in the record does not cure his waiver. See Jenkins v. Commonwealth, 244 Va. 445,

Similarly in his first assignment of error, Burns challenges the constitutionality of the Virginia capital murder statute.  However, on brief, he relied solely on his memorandum presented to the circuit court with regard to this issue.  Burns' reference to argument that he made in the circuit court "is insufficient and amounts to procedural default."  Jenkins, 244 Va. at 461, 423 S.E.2d at 370.

### B. GUILT PHASE

### 1. INDICTMENT

Burns contends that the circuit court erred by failing to quash the capital murder indictment on the basis that he was denied a preliminary hearing and the indictment was multiplicious.  When Burns was arrested on September 26, 1998, he was charged with first degree murder.  However, after he was indicted by a grand jury on two counts of capital murder, an order of nolle prosequi was entered with regard to the first degree murder charge.  So, Burns never had a preliminary hearing.  He now claims that he was entitled to that hearing pursuant to Code § 19.2-218 because both the capital murder and first degree murder charges arose out of the same circumstances.  He also argues that the

_____

461, 423 S.E.2d 360, 370 (1992), cert. denied, 507 U.S. 1036 (1993).

13

Commonwealth's failure to afford him a preliminary hearing deprived him of substantive and due process rights.

In pertinent part, Code § 19.2-218 provides that "[n]o person who is arrested on a charge of felony shall be denied a preliminary hearing." As the Commonwealth correctly notes, this provision does not apply to the present situation. Burns was not arrested on the charges of capital murder; he was arrested on the charge of first degree murder. The capital murder charges were brought by a direct indictment. "[T]his Court has consistently held that a preliminary examination of one accused of committing a felony is not necessary where an indictment has been found against him by a grand jury." Webb v. Commonwealth, 204 Va. 24, 30-31, 129 S.E.2d 22, 27 (1963); accord Waye v. Commonwealth, 219 Va. 683, 689, 251 S.E.2d 202, 206, cert. denied, 442 U.S. 924 (1979). Thus, the procedure used to indict Burns, without affording him a preliminary hearing, did not violate any of his statutory rights.[8]  Id.

---

[8] There is no constitutional right to a preliminary hearing. Ashby v. Cox, 344 F. Supp. 759, 763 (W.D. Va. 1972).

To the extent that Burns suggests that he was entitled to a preliminary hearing on the charge of first degree murder, that issue is moot. A nolle prosequi order was entered on that charge, and Burns was tried and convicted on the indictment.

14

Burns also contends that the indictment was multiplicious because he was charged in one count with three separate offenses of capital murder. Thus, according to Burns, the indictment was confusing and caused a "multiplication of issues."

The original indictment contained two counts charging Burns with the commission of capital murder. The first count alleged that he committed capital murder in the commission of robbery, and the second count alleged that he committed capital murder in the commission of, or subsequent to, rape or object sexual penetration. The Commonwealth amended the first count to allege that Burns "did unlawfully, feloniously, willfully, deliberately, and with premeditation kill and murder Tersey Elizabeth Cooley, in the commission of robbery or forcible sodomy or rape . . . ."[9] The defendant voiced no objection to that amendment. The Commonwealth then asked that the amendment say "and/or" rather than just "or." When the court asked the defendant if he objected to the new wording, his counsel responded, "if I have an objection to it, I will file it at a later date." The court then stated that it would allow the amendment, and the defendant's counsel replied, "I will object to it, subject to me

_____

[9] At the same time, the Commonwealth moved the circuit court to "nol-pross" the second count.

15

submitting a motion on that. If I do not submit a motion, then I will waive the objection."

In a subsequent order dated October 20, 1999, the court granted "the motion over the objection of the Defendant, but the Defendant will waive this objection unless he files his written objection stating his grounds therefore within two (2) weeks of this date." Burns never filed the referenced objection within the allotted time, but on January 25, 2000, he moved for leave to challenge the amendment and to dismiss the indictment on the ground that it is multiplicious. The Commonwealth asserts on brief that the motion was never ruled on by the circuit court and that Burns' multiplicity claim is therefore waived. The Commonwealth is wrong. After a hearing during which Burns argued his motion, the court denied the motion in an order dated February 4, 2000, and noted the defendant's objection.

However, we agree with the circuit court that the indictment, as amended, contained only one charge of capital murder and merely provided alternative "gradation" offenses.[10] Graham v. Commonwealth, 250 Va. 487, 491, 464

---

[10] Since the circuit court struck the evidence on the robbery charge, neither that offense nor the offense of capital murder in the commission of robbery was before the jury. Burns was convicted under Code § 18.2-31(5), which

16

S.E.2d 128, 130 (1995). The indictment did not contain more than one charge in a single count. See Webb, 204 Va. at 32, 129 S.E.2d at 28. The amended indictment also clearly notified Burns of the offense for which he was charged. Thus, the circuit court did not err in denying Burns' motion to dismiss the indictment on the basis of multiplicity.

## 2. SUPPRESSION OF EVIDENCE

Burns argues that the circuit court erred by denying his motion to suppress evidence. That motion included all his statements to law enforcement officers; physical evidence, including DNA testing results, seized from his person and residence; and all documents obtained from him. Burns contends that the roadblock was unconstitutional; that his statements were not voluntarily made and thus violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966); that his fingerprints, hair, and samples of bodily fluids were not voluntarily provided; and that search warrants issued for his personal property at the Shenandoah County Jail and his residence were based on misleading information. We will address each of these grounds separately.

### a. ROADBLOCK

---

proscribes, in relevant part, capital murder in the commission of rape or forcible sodomy.

17

Burns asserts that the roadblock that Sheriff Green set up on the evening of September 21st did not pass constitutional muster because the roadblock was established at the sole discretion of law enforcement officers at the crime scene, there was no plan regarding the particular time and place of the roadblock, and there were no neutral criteria for carrying out the roadblock.  The Commonwealth disagrees and contends that Burns' argument is flawed because Burns voluntarily stopped his vehicle before he reached the roadblock rather than actually being stopped at the roadblock.  Alternatively, the Commonwealth argues that, if Burns was stopped, the roadblock satisfied the three-prong test enunciated in Brown v. Texas, 443 U.S. 47 (1979), as adopted by this Court in Lowe v. Commonwealth, 230 Va. 346, 337 S.E.2d 273 (1985), cert. denied, 475 U.S. 1084 (1986). While we believe that the circumstances under which Burns stopped his vehicle as he approached the roadblock was a "stop" and thus a "seizure" under the Fourth Amendment, see id. at 349, 337 S.E.2d at 275, we agree with the Commonwealth that the roadblock did not violate Burns' constitutional rights.

The constitutional legitimacy of a roadblock, such as the one in this case, is determined by weighing "(1) the gravity of the public concerns served by the seizure, (2) the

18

degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty." Id. at 350, 337 S.E.2d at 276. A roadblock is not an unconstitutional infringement on an individual's privacy if it is "carried out pursuant to a plan or practice which is explicit, contains neutral criteria, and limits the conduct of the officers undertaking the roadblock." Simmons v. Commonwealth, 238 Va. 200, 203, 380 S.E.2d 656, 658 (1989).

The roadblock at issue satisfies these requirements. Sheriff Green decided to establish the roadblock because a brutal homicide had been recently committed in the area of the roadblock, and because law enforcement officials did not know the identity of the perpetrator or whether that person was still in the area. According to Sheriff Green, the purpose of the roadblock was to "canvas drivers who were passing through the area, to see whether they had seen anything or heard anything" during the time period when the crime had probably been committed the previous day. Certainly, the fact that a murder had occurred was a matter of grave public concern, and the roadblock advanced that concern by aiding in the investigation of the crime.

Additionally, Sheriff Green chose the location of the roadblock and directed that it be conducted between the hours of 7:00 p.m. on September 21st until approximately 11:30 a.m.

19

on September 22nd because he believed that the crime had been committed between those hours on September 20th-21st. He also directed that all vehicles be stopped and that the operators be asked "if they were through that section during those times, and if they were, did they see anything of a suspicious nature in or around [the victim's house]." If the drivers inquired about what had happened, they were to be told only that an incident had occurred; they were not to receive specific information about the crime. Thus, the roadblock was carried out pursuant to an explicit plan that contained neutral criteria, and limited the discretion and conduct of the law enforcement officers actually stopping vehicles at the roadblock.

However, our analysis of this issue does not end here. Recently, the Supreme Court of the United States considered the constitutional propriety of a highway checkpoint program whose primary purpose was to discover and interdict illegal narcotics. Indianapolis v. Edmond, ___ U.S. ___, ___, 121 S.Ct. 447, 450 (2000). After discussing several of its prior decisions, see e.g., Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990); United States v. Martinez-Fuerte, 428 U.S. 543 (1976); Delaware v. Prouse, 440 U.S. 648 (1979), the Court stated that "each of the checkpoint programs that we have approved was designed primarily to serve purposes

20

closely related to the problems of policing the border or the necessity of ensuring roadway safety." Edmond, ___ U.S. at ___, 121 S.Ct. at 454. Thus, the Court concluded that the narcotics checkpoint program contravened the Fourth Amendment because its purpose was "to uncover evidence of ordinary criminal wrongdoing." Id. In reaching this conclusion, the Court "decline[d] to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." Id. at 455. However, the Court recognized that "there are circumstances that may justify a law enforcement checkpoint where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control." Id.

The primary purpose of the roadblock that Sheriff Green established obviously was not related to policing the borders or ensuring road safety. Nor was its purpose simply to investigate ordinary criminal wrongdoing as was the checkpoint in Edmond. Instead, the roadblock in this case was specifically designed to investigate a particular murder that had recently occurred in the area where the roadblock was placed. When Sheriff Green decided to set up the roadblock, the perpetrator's identity and whereabouts remained unknown. Law enforcement officers were not stopping

21

vehicles merely to discover evidence of crimes in general. Thus, we conclude that the roadblock in this case falls within the exigent circumstances recognized by the Supreme Court in Edmond and that it, therefore, did not contravene the Fourth Amendment.[11]

### b. STATEMENTS AND PHYSICAL EVIDENCE

Burns contends that the circuit court erred by failing to suppress his statements given to law enforcement officers on September 21st, 26th, and 27th. He raises specific objections with regard to each statement, so we will consider them separately.

Commencing with the September 21st statement, Burns claims that Gochenour provided only a "cursory rendition" of Burns' Miranda rights. Therefore, the record, according to Burns, does not show that he sufficiently understood those rights to enable him to make a voluntary and intelligent waiver of them. We do not agree.

---

[11] Even if the roadblock violated Burns' Fourth Amendment rights, we believe that any connection between the roadblock and the statements and physical evidence obtained from Burns was entirely dissipated. See Wong Sun v. United States, 371 U.S. 471, 491 (1963); Warlick v. Commonwealth, 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974). As will be discussed in subsequent sections of this opinion, Burns was not in custody when he voluntarily spoke with Gochenour at the site of the roadblock. Nevertheless, Gochenour advised Burns of his Miranda rights. Burns subsequently agreed to go to the sheriff's department and hospital.

"Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " Oregon v. Mathiason, 429 U.S. 492, 495 (1977); accord Bailey v. Commonwealth, 259 Va. 723, 745, 529 S.E.2d 570, 583, cert. denied, ___ U.S. ___, 121 S.Ct. 488 (2000). As the circuit court correctly determined, Burns was not "in custody" when he talked with Gochenour on the evening of September 21st.[12] After Burns stopped at the roadblock and asked Sheriff Green what was going on, Burns voluntarily got into a police vehicle and talked with Gochenour. Burns subsequently agreed to go to the sheriff's office to be fingerprinted. Even then, he traveled there in his own vehicle, which is certainly not an indicia of being "in custody." After arriving at the sheriff's office, Burns was taken into an office that contained several desks and a computer. It was not an interview room or a cell, and the office was not locked. Thus, even though Gochenour advised Burns of his Miranda rights both at the roadblock and again upon arriving at the sheriff's office, we conclude that Burns was not in custody at either time. Consequently, he has no basis upon which to allege that the statements obtained on September 21st violated his Fifth Amendment rights.

---

[12] The circuit court also concluded that Miranda rights were given to Burns and that he made a voluntary and knowing

We reach the same conclusion with regard to Burns'
September 26th statement.  Although Burns argues that he was
not advised of his Miranda rights before he made this
particular statement, the evidence before the circuit court
reflects that Burns again was not in custody when he made
that statement.  Burns had previously agreed to provide some
receipts to Gochenour in order to document Burns' activities
on the night of the murder.  On September 26th, Burns and
Gochenour talked by telephone, and Burns agreed to bring
those receipts to the sheriff's office that evening around
8:00 p.m.  After he arrived, Gochneour again read Miranda
rights to Burns, and Burns then signed a written waiver
acknowledging that he understood those rights and that he
wished to talk to the law enforcement officers.  During the
subsequent interview, Burns admitted that he had been in
Cooley's residence on the night of her murder and claimed
that he had killed an unidentified black male whom he had
encountered there.  Near the end of the interview, Burns
requested an attorney, and the interview was terminated.
Burns then asked to use a restroom, after which Gochenour
arrested him.  Thus, Burns voluntarily came to the sheriff's
office that evening and was never in custody until after he
made the statement.

_____

waiver of those rights on September 21st.

24

After the interview on September 26th ended, Gochenour told Burns that, if he wanted to talk to anyone again, he could inform a jailer of that desire.  According to Gochenour, he received such a call from a jailer on September 27th.  After returning to the jail, Gochenour first advised Burns of his Miranda rights and then asked Burns if he had requested to speak with Gochenour.  The transcript of that taped interview reflects that Burns responded affirmatively to that question.

Nevertheless, Burns contends that, when he contacted the jailer on September 27th, he did not intend to subject himself to further interrogation by a police officer. Relying on McNeil v. Wisconsin, 501 U.S. 171 (1991), Burns argues that, once he asserted his right to counsel, he could not be approached for further interrogation until counsel was available to him.  We do not agree with Burns' argument.

As the circuit court concluded, Burns initiated contact with Gochenour on September 27th.  "If 'the accused, not the police, [reopens] the dialogue with the authorities', a court, upon consideration of that fact and 'the totality of the circumstances', may reasonably find that the accused has made a 'knowing and intelligent' waiver of his rights." Harrison v. Commonwealth, 244 Va. 576, 583, 423 S.E.2d 160, 164 (1992) (quoting Edwards v. Arizona, 451 U.S. 477, 486 n.9

25

(1981)).  Here, the totality of the circumstances, including the fact that Burns requested to speak with Gochenour and that Gochenour re-advised Burns of his Miranda rights before even inquiring whether Burns had made such a request, support the circuit court's conclusion that Burns' September 27th statement was "knowingly and intelligently and voluntarily made."

In addition to these specific objections to each of his statements, Burns also asserts three additional reasons why none of his statements "were voluntary in the constitutional sense."  First, he claims that his intellectual functioning, psychological problems, recent use of alcohol, and mental and physical condition rendered him incapable of voluntarily making the statements.  Next, he argues that Gochenour "used the prospect of the defendant seeing his wife" as a means of pressuring Burns to the point that his ability to function was critically impaired.  Finally, Burns claims that Gochenour repeatedly asked him to submit to a polygraph examination, thus subjecting Burns to increased pressure.

Again, the record supports the circuit court's conclusion that all of Burns' statements were made knowingly, voluntarily, and intelligently.  Although Burns was declared incompetent to stand trial at one point before the trial commenced, his competency was restored, and there is no

evidence that he was suffering from depression or was incompetent when he made the statements to Gochenour. His ability to understand and act voluntarily is further reflected by the fact that he requested an attorney at one point during the interview on September 26th. In short, the totality of the circumstances demonstrates that Burns' statements were " 'the product[s] of an essentially free and unconstrained choice by [their] maker.' " Gray v. Commonwealth, 233 Va. 313, 324, 356 S.E.2d 157, 163, cert. denied, 484 U.S. 873 (1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)); accord Yeatts v. Commonwealth, 242 Va. 121, 132, 410 S.E.2d 254, 261 (1991), cert. denied, 503 U.S. 946 (1992).

Burns makes the same argument that his fingerprints, hair, and samples of bodily fluids were taken in violation of his constitutional rights. He claims that he did not execute a written consent or waiver, and that his oral consent to be fingerprinted and to provide hair and bodily fluids for the PERK Kit was not "voluntarily, intelligently or freely given." For the reasons that we have already enunciated, we do not agree. We have also recognized that consent to a body search may be oral as well as written. Coleman v. Commonwealth, 226 Va. 31, 49, 307 S.E.2d 864, 874 (1983), cert. denied, 465 U.S. 1109 (1984).

27

Furthermore, according to Gochenour, Burns asked several questions about how the bodily fluids would be obtained. Those inquiries evidence Burns' understanding of the PERK Kit and what he was being asked to do. Gochenour also testified that, while Burns was waiting at the hospital, Burns stated that his stomach was hurting and that he would have to leave and come back later if the medical personnel did not hurry.

When Burns went into the examination room at the hospital, Thomas accompanied him into that room. Thomas testified that, when the medical personnel asked Burns to remove his underwear, Burns stated that he did not know that his underwear would be taken. At that point, Thomas advised Burns, "Well, you know, if you don't want to do this, you don't have to, we can stop now." According to Thomas, Burns indicated that he wanted to go ahead and get it over. Thus, the circuit court did not err in refusing to suppress the results of the tests conducted on Burns' fingerprints, hair, and samples of bodily fluids.

### c. SEARCH WARRANTS

Citing Franks v. Delaware, 438 U.S. 154 (1978), Burns argues that the search warrants issued for his personal property at the jail and for his residence were based on misleading information and that, therefore, any evidence seized as a result of those searches must be suppressed. In

the affidavit to obtain the warrants, Thomas included Burns'
admission that he had committed a sexual assault against
Cooley, but failed to mention Burns' statements in which he
denied any criminal involvement in Cooley's murder and
claimed that he was attempting to cover up the murder to
protect another individual.

This argument has no merit.  We agree with the circuit
court that Burns' admission regarding the sexual assault
established probable cause for issuance of the search
warrants.  Burns offered no evidence at the suppression
hearing to show either an intention to deceive the magistrate
or a reckless omission of relevant information.  A police
officer's mere negligence "in checking or recording the facts
relevant to a probable-cause determination" is not enough to
necessitate further inquiry.  Id. at 170; see also United
States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990).

3. EXAMINATION OF INVESTIGATORS UNDER OATH

Prior to trial, Burns moved to examine law enforcement
officials under oath to determine whether such officials had
disclosed all exculpatory evidence to the Commonwealth's
Attorney.  The circuit court denied the motion but directed
the Commonwealth's Attorney to explain the meaning of
exculpatory evidence to the police officers and ask whether

29

all exculpatory evidence had been given to the Commonwealth's Attorney.

Burns now claims that "the problem of police-concealed exculpatory evidence is pervasive . . . throughout the country" and that the court's failure to grant Burns' motion "impinged on [Burns'] constitutional right to effective assistance of counsel." He also asserts the court's ruling violated his Fourteenth Amendment right to a fair trial and due process of law. This argument is without merit.

First, to the extent that Burns raises an ineffective assistance of counsel claim, such a claim is not cognizable on direct appeal. Johnson, 259 Va. at 675, 529 S.E.2d at 781. Second, Burns has offered no authority for the proposition that he should have been allowed to examine the police investigators under oath merely to determine whether they had turned over all exculpatory evidence to the Commonwealth's Attorney. In Kyles v. Whitley, 514 U.S. 419, 437 (1995), the Supreme Court of the United States recognized that it is "the individual prosecutor [who] has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Finally, Burns admitted that the Commonwealth's Attorney had disclosed all exculpatory evidence in his possession, and the

circuit court directed the prosecutor to ensure that the investigators had provided all such evidence.

## 4. JURY SELECTION

With regard to jury selection, Burns first claims that the trial court erred by precluding him from asking questions during voir dire to ascertain potential jurors' "true feelings" about the death penalty. Both parties submitted a list of proposed voir dire questions to the circuit court, and the court asked some, but not all, of those questions. During Burns' voir dire of the jurors, his counsel asked whether any of them had "any particularly strong feelings for or against the death penalty." The court sustained an objection to the question because it was not asked in response to a juror's specific answer to any previous question.

The circuit court did not err in disallowing this particular voir dire question. We stated in Mackall v. Commonwealth, 236 Va. 240, 251, 372 S.E.2d 759, 766 (1988), cert. denied, 492 U.S. 925 (1989), that "either party may require prospective jurors to state clearly that whatever view they have of the death penalty will not prevent or substantially impair their performance as jurors in the conformity with their oath and the court's instructions." However, we held "that a party may [not] inquire what

31

prospective jurors' views of the death penalty might be."
Id. Furthermore, here, as in Mackall, the circuit court
repeatedly asked potential jurors such questions as whether
they would automatically impose the death penalty and whether
they would consider voting for a sentence less than death,
that is, life without parole, depending on the evidence. The
court's questions assured " 'the removal of those [potential
jurors] who would invariably impose capital punishment.' "
Mueller v. Commonwealth, 244 Va. 386, 400-01, 422 S.E.2d 380,
390 (1992), cert. denied, 507 U.S. 1043 (1993) (quoting
Turner v. Commonwealth, 221 Va. 513, 523, 273 S.E.2d 36, 42-
43 (1980), cert. denied, 451 U.S. 1011 (1981)).

Burns also challenges the circuit court's decision to
strike juror Trina H. Bailey for cause and its refusal to
strike juror Emma M. Smith for cause. Concerning juror
Bailey, Burns argues that she was improperly struck because
she expressed some doubt about the death penalty. However,
the record shows that the circuit court granted the
Commonwealth's motion to strike this juror because she
indicated that she would hold the Commonwealth to a higher
burden of proof than is required by law because the death
penalty was at issue in the case. Burns moved to strike
juror Smith because she stated, "if [the defendant] did it, I
feel like that he should get [the death penalty]," and also

32

because her son was a jailer at the Shenandoah County Jail. However, Smith stated that she had not discussed the case with her son, and, in response to several questions, she indicated that she could listen to the evidence and determine the appropriate punishment. When asked if it would be difficult for her to vote for life imprisonment if she found Burns guilty of capital murder, Smith answered, "Not really, no."

Upon considering the entire voir dire of both jurors at issue, see Mackall, 236 Va. at 252, 372 S.E.2d at 767, ("entire voir dire examination must be considered"), we find no error in the circuit court's decisions regarding those jurors. The circuit court heard those jurors' responses and observed their demeanor. Therefore, its findings are entitled to great weight and will not be reversed on appeal absent a "showing of manifest error or abuse of discretion." Id. No such showing has been made in this case.

### 5. PHOTOGRAPHIC EVIDENCE

Burns asserts that the trial court erred in admitting into evidence certain photographs of the victim's body, specifically Exhibit Numbers 141, 142, 143, and 146. He also challenges the court's decision to admit into evidence all the autopsy photographs of the victim. In Burns' limited

33

argument on this issue, he merely asserts that these photographs were prejudicial and cumulative.

We have repeatedly held that the admission of photographic evidence rests within the sound discretion of the trial court.  See Hedrick v. Commonwealth, 257 Va. 328, 338, 513 S.E.2d 634, 639, cert. denied, 528 U.S. 952 (1999); Walton v. Commonwealth, 256 Va. 85, 91-92, 501 S.E.2d 134, 138, cert. denied, 525 U.S. 1046 (1998); Goins v. Commonwealth, 251 Va. 442, 459, 470 S.E.2d 114, 126, cert. denied, 519 U.S. 887 (1996).  We have examined all the photographs admitted into evidence and conclude that the circuit court did not abuse its discretion.

### 6. TRANSCRIPT OF VIDEOTAPED CONVERSATION

On September 20th, Burns went to the home of his friend, Hazel Buckley, between 10:30 p.m. and 11:00 p.m.  While he was there, Burns, according to Buckley, told her that "[h]e had done something really bad."  Buckley testified that Burns then stated that he would need to account for his whereabouts from about 7:30 p.m. until 12:00 p.m. that evening.  Buckley later contacted the police and agreed to assist in the investigation of Cooley's murder by allowing a subsequently arranged meeting between her and Burns to be videotaped.

At trial, the Commonwealth played the videotape of the meeting for the jury and, over Burns' objection, provided the

jury with a transcript of the conversation between Buckley and Burns as the tape was played. On appeal, Burns argues that the circuit court erred in allowing the jury to use the transcript because it "contained numerous 'inaudible' references and numerous gaps." Burns also claims that the transcript highlighted portions of the conversation that were prejudicial to him.

"A court may, in its discretion, permit the jury to refer to a transcript, the accuracy of which is established, as an aid to understanding a recording." Fisher v. Commonwealth, 236 Va. 403, 413, 374 S.E.2d 46, 52 (1988), cert. denied, 490 U.S. 1028 (1989). Burns has not challenged the accuracy of the transcript, only its completeness. That fact, coupled with the lengthy cautionary instruction that the circuit court gave the jury regarding the portions of the transcript that indicated the videotape was inaudible and advising the jurors to decide for themselves what was being said, persuade us that the court did not abuse its discretion in allowing the jury to use the transcript.

7. TESTIMONY REGARDING COOLEY'S POWER OF ATTORNEY

During cross-examination of Penny's sister, Linda, Burns attempted to elicit testimony regarding why Cooley revoked her power of attorney naming Penny as Cooley's attorney-in-fact. The court sustained the Commonwealth's objection.

However, the court allowed cross-examination to establish "that there was a new power of attorney, a revocation, and it was at the request of Mrs. Cooley." Later, during his case-in-chief, Burns called Kermit L. Racey, Cooley's attorney, and attempted to ask Racey why Cooley had revoked her power of attorney. The court again sustained the Commonwealth's objection. Burns later proffered Racey's testimony that there were two reasons why Cooley revoked her power of attorney. The first reason was because Penny lived too far away to take care of her mother's needs, and the second one was the fact that a judgment had been entered against Cooley on a promissory note that Penny had signed by using her mother's power of attorney. The proceeds of the loan evidenced by the note were for Penny's benefit.

On appeal, Burns contends that the excluded evidence should have been admitted to show that Penny had a motive to murder her mother. However, the jury heard evidence from Linda and Racey that Cooley had revoked the power of attorney. Burns also introduced into evidence a notice that a judgment entered against "PENNY M. COOLEY & TERSEY COOLEY (PENNY COOLEY (BURNS) POWER OF ATTORNEY FOR TERSEY)" in West Virginia had been docketed in Shenandoah County. Thus, we conclude that, if there was error in excluding the reasons

why Cooley revoked the power of attorney, it was clearly harmless.

### 8. TESTIMONY CONCERNING BURNS' PROBATION STATUS AND PRIOR ACTS OF VIOLENCE

Prior to trial, Burns filed a motion in limine to exclude, during the guilt phase of his trial, references to his probation status and to other offenses contained in his statements to law enforcement officials. He specifically objected to that portion of his statement to Gochenour where Burns stated that he had to keep good records, including receipts, because he was on probation. Burns also objected to the statement, attributed to him by Buckley, that he had done something "worse than his drug runs, and it was worse than anything he had done." With regard to each statement, the Commonwealth argued that its probative value outweighed any prejudice to the defendant. The circuit court agreed, and so do we.

Burns referenced his probation status in an effort to create an alibi for himself on the night of Cooley's murder. Similarly, his comment to Buckley reflects his awareness of the seriousness of the crime he had committed and the reason he needed her help to establish an alibi. "The responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion

of the trial court.  The exercise of that discretion will not be disturbed on appeal in the absence of a clear abuse." Spencer v. Commonwealth, 240 Va. 78, 90, 393 S.E.2d 609, 617, cert. denied, 498 U.S. 908 (1990) (citing Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986)). We find no abuse of that discretion with regard to this issue.

Burns also argues that the court erred in allowing into evidence his wife's testimony concerning prior episodes of violence and threatening conduct, and Burns' tendency to become sexually aggressive when he consumed alcohol. However, the court allowed the evidence only for the purpose of showing why Penny left her residence on September 20th. Furthermore, the jury heard the court's ruling in open court, and Burns did not request the court to give the jury a more explicit cautionary instruction.  See Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 607 (1990).  Thus, we find no error in the court's admission of this testimony.  Its probative value to explain why Penny left her home on September 20th and took a circuitous route to a friend's house outweighed any prejudice to the defendant.

### 9. MARITAL COMMUNICATIONS

While incarcerated awaiting trial, Burns wrote several letters to his wife.  Those letters contained incriminating

statements by Burns and differing versions of the events surrounding Cooley's murder. Penny turned the letters over to Thomas, who had the letters examined by a handwriting expert. That examination revealed that Burns had written the letters.

Relying on Code § 8.01-398, Burns filed a motion in limine to exclude the letters from evidence. The circuit court concluded that "[t]he statute does not prevent a third party who is in possession of the letters, and has gained that possession lawfully, from testifying." Therefore, the court denied Burns' motion, and the letters were introduced into evidence during the trial through the testimony of Thomas. Penny did not testify about the letters.

On appeal, Burns contends that the privilege created in Code § 8.01-398 is separate and distinct from the privilege granted in Code § 19.2-271.2, and that the former privilege applies in any case irrespective of whether the spouse of an accused testifies. According to Burns, the court's ruling eviscerates the marital privilege and renders it meaningless with regard to written communications. We do not agree.

Code § 8.01-398(A) provides:

> Husband and wife shall be competent witnesses to testify for or against each other in all civil actions; provided that neither husband nor wife shall, without the consent of the other, be examined in any action as to any communication privately made by one to the other

> while married, nor shall either be permitted, without such consent, to reveal in testimony after the marriage relation ceases any such communication made while the marriage subsisted.

As Burns argues, we have construed the privilege embodied in this statute broadly to include "all information or knowledge privately imparted and made known by one spouse to the other by virtue of and in consequence of the marital relation through conduct, acts, signs, and spoken or written words." Menefee v. Commonwealth, 189 Va. 900, 912, 55 S.E.2d 9, 22 (1949). However, the plain words utilized in this statutory provision limit the privilege to situations where a spouse is being examined in an action or is revealing a private communication through testimony. When a statute does not contain an express definition of a term, we infer the intent of the legislature from the plain meaning of the words used. City of Virginia Beach v. Flippen, 251 Va. 358, 362, 467 S.E.2d 471, 473 (1996). Consequently, since Penny did not testify about the letters or their content, Code § 8.01-398(A) does not apply to the present situation. Thus, the circuit court did not err in admitting Burns' letters into evidence through the testimony of a law enforcement officer.

### 10. COMPETENCY EVALUATION DURING TRIAL

On the second day of trial during the playing of the audio-tape of Burns' September 26th statement, Burns' counsel

40

moved, pursuant to Code § 19.2-169.1, to have the defendant evaluated for his competency to stand trial.[13]  At that time, Burns' counsel proffered to the court that Burns had advised his counsel that he did not want to participate anymore, and wanted to leave the courtroom and return to the jail.  After hearing argument of both counsel, the court questioned Burns about his wish to leave the courtroom.  Burns repeatedly said that he did not want to remain in the courtroom even though the court advised Burns about the importance of his presence at his trial.  The court then decided to recess for about one hour and twenty minutes.

After the recess, Burns returned to the courtroom.  His counsel proffered that Burns had expressed his willingness to remain in the courtroom throughout the proceedings but that Burns had indicated that he was having difficulty understanding what was transpiring.  Burns' counsel then moved again for an evaluation under Code § 19.2-169.1.  In doing so, counsel quoted from Dr. Stejskal's June 10, 1999

---

[13] Prior to trial, the circuit court found Burns incompetent to stand trial based on an evaluation conducted by Dr. William J. Stejskal, a licensed clinical psychologist. Consequently, the court directed that Burns be committed on an inpatient basis for further evaluation and for treatment to restore his competency.  Approximately four months later, the court, after hearing evidence and argument, found that Burns' competency had been restored.

report, in which Dr. Stejskal stated that Burns' "capacity to assist in his own defense is marginally intact."

Before ruling on the motion for a competency evaluation, the court called the jail nurse, Bonnie Sager, to testify as a witness. Sager explained the medications that had been prescribed to treat Burns' anxiety and depression, and to help him sleep. She further stated that she had given Burns his medicine at noon that day and that the jail records indicated that Burns had been receiving his medications. Finally, Sager described Burns as having occasional mood changes when he became angry.

The court then denied the motion and made the following relevant findings:

> On June 23rd, 1999, I determined that [Burns] competency had been restored, based on the opinion of Dr. Stejskal and the psychologist from Central State . . . .

> Now, while the psychologist from Central State did agree that Mr. Burns suffered from depression and did need medication, she had also found, during the course of the treatment, that he was malingering—that is, acting—for a period of time. . . . [T]here are letters from Mr. Burns, or at least one letter, where he admits to acting.

> I also note that Dr. Stejskal was appointed to be the Defendant's mental-health expert, and the Defendant has already given notice that he does not intend to use him in mitigation. Now, there can be a lot of reasons for that, but again, it would indicate to me that this problem that we are experiencing today, while it might have some background, is fairly sudden.

He has prescribed medication.  Dr. Stejskal suggested that, in order for him to be competent to stand trial, he must be given medication, as needed and as prescribed.  We have evidence from the jail nurse that he is being furnished all of his medications, as prescribed.

Mr. Burns' conduct in this trial, until this morning, until his statement, his audio statement to Mr. Gochenour was being played, was alert and attentive, he participated.  I saw him, numerous times, talking with Counsel during voir dire.  Certainly, he took notes at other times.  During the course of this trial, he has taken notes and has interacted with Counsel, all of those things that I would expect him to do as the Defendant in this case.

He did get upset, visibly upset, as the statement was being played, and there could be a whole number of reasons for that.  It was obviously stressful to him at the time, he was emotional, at times, when giving the statement, and that stress may now be recalled.  It may be that, hearing his statement today, he perceives it as being harmful to his case, and that could be a depressing event to anybody.  And, perhaps, hearing the statement, and playing it, may bring this whole episode, and that, too, may be upsetting to him.

Now, during the pendency of this case, Mr. Burns has written me a number of letters in chambers, all of which I have shared with Counsel.  I am now making this part of this record, for this purpose: because I think those letters indicate that he does understand the proceedings against him.  Many of the letters were challenging the officers' statements, as to what he told them and how he was treated, which is exactly the statements being played here today.  And as I say, there are a number of things covered in the letters, but, by and large, it would indicate to me that he did indeed understand the proceedings against him, and understood just how important his own statements may be in the case against him.

Earlier today, when I was asking him questions on the record, his responses were inaudible, not necessarily nonsensical.  The bits and pieces that I

could understand were responsive to my questions. All told, though, they were simply inaudible.

The other thing I think is worthy of note that the attorneys have advised the Court, and Mr. Burns has advised the Court, that he has made the request, several times, not to be present at the trial. So his request earlier today is consistent with a request made pretrial, when there was no immediate question as to his competency.

Code § 19.2-169.1 provides, in pertinent part, that "[i]f . . . the court finds, upon hearing evidence or representations of counsel for the defendant or the attorney for the Commonwealth, that there is probable cause to believe that the defendant lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense, the court shall order that a competency evaluation be performed . . . ." Upon our review of the record, we do not find probable cause to believe that Burns' mental state deteriorated to the point that he was no longer competent to stand trial. The jail nurse indicated that Burns had been receiving his medications, and until the tape of his September 26th statement was played for the jury, he had actively interacted with his counsel during the proceedings. As the circuit court observed, it is entirely understandable that Burns would become upset upon hearing his statement to Gochenour. Also notable is the fact that Burns had apparently expressed a desire to his counsel, even before

44

the tape was played, not to be present at his trial.  Thus, we conclude that the circuit court did not err in refusing to order a competency evaluation during the trial of this case.

11. SUFFICIENCY OF THE EVIDENCE

Burns argues that the evidence is insufficient to sustain the jury's verdict finding him guilty of the offenses of capital murder, rape, forcible sodomy, and statutory burglary.  He claims that, because he was allegedly intoxicated, and because the Commonwealth's evidence was in conflict regarding Burns' whereabouts on the night of Cooley's murder, the Commonwealth failed to prove beyond a reasonable doubt that he committed a willful, deliberate, and premeditated murder.  He also claims that there was insufficient evidence of penetration to support his convictions for rape and forcible sodomy.  Finally, Burns concedes that the evidence established that he broke into and entered Cooley's residence, but he asserts that the evidence failed to show that he did so with the intent to commit murder or rape.  We do not agree with any of Burns' arguments regarding the sufficiency of the evidence.

As we said earlier in this opinion, we must view the evidence in the light most favorable to the Commonwealth and afford that evidence all reasonable inferences that are fairly deducible from it.  Horton, 255 Va. at 608, 499 S.E.2d

45

at 259.  Under that standard of review, we affirm the judgment of the circuit court unless that judgment is without evidence to support it or is plainly wrong.  Id.

Viewed in the light most favorable to the Commonwealth, the evidence showed that Burns had been drinking prior to Cooley's murder, but, as the circuit court noted in ruling on Burns' motion to strike the Commonwealth's evidence, Burns was not "so intoxicated as to be unable to premeditate."  He drove his vehicle to several different locations on the evening of the murder and even asked Buckley to help him establish an alibi.  The alleged conflicts in the evidence regarding Burns' whereabouts on the evening of Cooley's murder were matters for the jury to resolve.  As the fact finder, the jury was certainly free to reject Burns' self-serving statements regarding his activities on that evening.

As to the issue of penetration, Burns' position overlooks the fact that Burns' sperm were found on the vaginal and anal swabs taken from the victim.  In Spencer v. Commonwealth, 238 Va. 275, 284, 384 S.E.2d 775, 780 (1989), cert. denied, 493 U.S. 1036 (1990), we found that the presence of sperm in the victim's vagina alone was sufficient to support a finding that penetration had occurred. Furthermore, Tontarski reported the presence of sperm cells on a sheet and pillowcase recovered from the bedroom where

46

Cooley's body was found, on Cooley's lower denture found on the floor of the bedroom, on a washcloth found under Cooley's left thigh, and on several items recovered from Cooley's bathroom.  As we have already stated, the jury was free to reject Burns' self-serving statements, especially the statement that he digitally inserted his semen into Cooley in order to cover up the crime.

Finally, with regard to the statutory burglary conviction, the evidence already discussed along with the evidence detailing the circumstances of Cooley's murder and the wounds inflicted upon her are sufficient to establish Burns' intent to commit murder and/or rape when he broke into and entered Cooley's home.  Intent is frequently shown by circumstances or by a person's conduct.  Hargrave v. Commonwealth, 214 Va. 436, 437, 201 S.E.2d 597, 598 (1974).  Thus, we find sufficient evidence to support all the convictions in this case.

C. PENALTY PHASE ISSUES

1. REBUTTAL EVIDENCE FROM VIRGINIA<br>DEPARTMENT OF CORRECTIONS

At Burns' request prior to trial, a subpoena duces tecum was issued to a regional director of the Virginia Department of Corrections.  The subpoena sought "documents or records describing the daily inmate routine, general prison

47

conditions, and security measures at the Red Onion Correctional Center and Wallens Ridge State Prison, . . . and videotapes" of those facilities.  The Commonwealth moved to quash the subpoena, and after a hearing on that motion, the circuit court granted the motion.[14]

During the penalty phase of his trial, Burns attempted to introduce evidence concerning the conditions at those prisons in rebuttal to the Commonwealth's evidence of Burns' future dangerousness.  Burns' counsel reminded the court that subpoenas had been issued to the wardens of those two so-called "super-max" prisons, but since the court had indicated that it would grant a motion to quash those subpoenas, counsel had obtained newspaper articles from the Internet that discussed the security and life of a prisoner at those facilities.  Burns' counsel proffered those articles as "what the testimony would show."  The court adhered to its prior decision and did not admit the testimony.

Recognizing that this Court held in Walker v. Commonwealth, 258 Va. 54, 70, 515 S.E.2d 565, 574 (1999), cert. denied, 528 U.S. 1125 (2000), and Cherrix v.

---

[14] At Burns' request, subpoenas were also issued to the wardens of those facilities.  Since the Commonwealth's motion did not cover those subpoenas, the court's decision likewise did not address them.  However, the court indicated that it would make the same ruling if a motion to quash those subpoenas were before it.

Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 653, <u>cert. denied</u>, 528 U.S. 873 (1999), that evidence regarding the conditions of prison life in a maximum security prison is not proper mitigating evidence, Burns offered this evidence, not in mitigation, but in rebuttal to the Commonwealth's evidence of Burns' future dangerousness.  Burns argues that, since the only possible sentence for an accused convicted of capital murder is either the death penalty or life imprisonment without parole, the prison society is the only society to which such a defendant can ever pose a "continuing serious threat."  Code §§ 19.2-264.2 and -264.4(C).  Thus, according to Burns, evidence regarding the quality and structure of an inmate's life in a maximum security prison, as well as the prison's safety and security features, is relevant evidence to rebut the Commonwealth's evidence that a defendant would "commit criminal acts of violence" in the future.  <u>Id.</u>  We do not agree.

First, we have rejected the argument that a jury's determination, under Code §§ 19.2-264.2 and -264.4(C), regarding whether a defendant "would commit criminal acts of violence that would constitute a continuing serious threat to society" is restricted to a consideration of only the prison society.  <u>Lovitt v. Commonwealth</u>, 260 Va. 497, 517, 537 S.E.2d 866, 879 (2000).  Nevertheless, Burns contends that

49

his proffered evidence should have been admitted to dispel the misconception that prison life includes such features as weekend furloughs, conjugal visits, and unrestricted work privileges. However, the Commonwealth offered no such evidence regarding the nature of prison life for a defendant convicted of capital murder or any other felony. Nor did the Commonwealth introduce evidence about the number of violent crimes committed in prison or the likelihood that a prisoner could escape. Instead, the Commonwealth's evidence concerning Burns' future dangerousness consisted of his prior criminal record and unadjudicated criminal acts. Thus, Burns' evidence was not in rebuttal to any evidence concerning prison life.

Instead, Burns wanted to show, in rebuttal to the Commonwealth's evidence of his future dangerousness, that his opportunities to commit criminal acts of violence in the future would be severely limited in a maximum security prison. However, in Cherrix, we reiterated the principle that the United States Constitution "does not limit 'the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.'" Cherrix, 257 Va. at 309, 513 S.E.2d at 653 (quoting Lockett v. Ohio, 438 U.S. 586, 605 n.12 (1978)). Thus, the relevant inquiry is

not whether Burns could commit criminal acts of violence in the future but whether he would. Indeed, Code §§ 19.2-264.2 and -264.4(C) use the phrase "would commit criminal acts of violence." Accordingly, the focus must be on the particular facts of Burns' history and background, and the circumstances of his offense. In other words, a determination of future dangerousness revolves around an individual defendant and a specific crime. Evidence regarding the general nature of prison life in a maximum security facility is not relevant to that inquiry, even when offered in rebuttal to evidence of future dangerousness such as that presented in this case.

We also note that the cases relied upon by Burns with regard to this issue, specifically Gardner v. Florida, 430 U.S. 349 (1977), Skipper v. South Carolina, 476 U.S. 1 (1986), and Simmons v. South Carolina, 512 U.S. 154 (1994), are inapposite. In Gardner, the trial court imposed a sentence of death after reviewing the contents of a pre-sentence report, part of which had not been disclosed to the defendant. Gardner, 430 U.S. at 353. Skipper involved the trial court's refusal to allow the defendant to introduce evidence showing his good behavior in jail while awaiting trial. Skipper, 476 U.S. at 4. The Court in Skipper noted that the relevancy of that evidence was "underscored . . . by the prosecutor's closing argument, which urged the jury to

return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison." Id. at 5.  Unlike the evidence proffered by Burns, the evidence in Skipper was peculiar to that defendant's history and background.  Finally, Simmons required the giving of an instruction regarding life without parole when a defendant is parole ineligible and future dangerousness is at issue.  Simmons, 512 U.S. at 156.

Accordingly, we find no error in the circuit court's decision quashing the subpoena directed to the Department of Corrections and refusing to admit evidence about prison life in a maximum security prison in rebuttal to the Commonwealth's evidence in this case of Burns' future dangerousness.

2. CLOSING ARGUMENT OF COMMONWEALTH'S ATTORNEY

During closing argument in the penalty phase of this case, the Commonwealth's Attorney argued that Cooley was a modest, private person who had an "animal" enter her life. At that point, Burns objected and the court stated, "Hold on, Mr. Ebert [the Commonwealth's Attorney]."  The following colloquy then occurred:

> MR. EBERT:  Excuse me.  A person acting like an animal.  Excuse me.

> THE COURT:  All right.

52

MR. EBERT:  A person acting with depravity of mind.

MR. ALLEN [Burns' attorney]:  I have a motion, Your Honor.  And I will make the motion after he finishes.  Note my objection at this time.

THE COURT:  All right.

MR. EBERT:  Excuse me, ladies and gentlemen.  I don't mean to characterize him as an animal.  But I will characterize him as a human being with a depravity of mind, a person who acted in a vile, horrible, inhumane way, to an innocent person.

After the Commonwealth's Attorney concluded his closing argument, Burns argued that the reference to an "animal" was improper and prejudicial, and that a mistrial was required.  He also complained because the court had not admonished the Commonwealth's Attorney at the time he made the statement.  The court then explained that, although Burns had objected at the time, it had not admonished the Commonwealth's Attorney because he had corrected the statement.  For the same reason, the court denied the motion for a mistrial.  Burns assigns error to that ruling.

Although the Commonwealth argues that Burns procedurally defaulted this assignment of error because he did not move for a mistrial at the moment "when the objectionable words were spoken," Reid v. Baumgardner, 217 Va. 769, 774, 232 S.E.2d 778, 781 (1977), we are not inclined to agree.  While Burns' counsel did not specifically move for a mistrial when the Commonwealth's Attorney said that an "animal" had entered

53

Cooley's life, he did object and advised the court that he had a motion that he would make after the Commonwealth's Attorney finished his closing argument. While the better practice would have been to move for a mistrial at that very moment, we cannot say under the circumstances of this case that Burns' motion came too late.[15] Accordingly, we will address the merits of this assignment of error.

In doing so, we are mindful of the principle that "[a] trial court exercises its discretion when it determines whether it should grant a motion for mistrial." Beavers v. Commonwealth, 245 Va. 268, 280, 427 S.E.2d 411, 420, cert. denied, 510 U.S. 859 (1993). "When a motion for mistrial is made, based upon an allegedly prejudicial event, the trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights are so 'indelibly prejudiced' as to necessitate a new trial." Spencer v. Commonwealth, 240 Va. 78, 95, 393 S.E.2d 609, 619, cert. denied, 498 U.S. 908 (1990) (quoting LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983), cert. denied, 464 U.S. 1063 (1984)). Unless we find that the trial court's denial of a mistrial is wrong as a matter of law, we will not disturb the

_____

[15] However, Burns never asked the court to instruct the jury to disregard the argument of the Commonwealth's

court's decision on appeal. Spencer, 240 Va. at 95, 393 S.E.2d at 619.

In the present case, we cannot say, as a matter of law, that the circuit court erred in denying Burns' motion for a mistrial. By the time that Burns moved for a mistrial, the Commonwealth's Attorney had retracted the reference to Burns as an "animal" and had stated to the jury three times, "Excuse me." Furthermore, despite the court's explanation why it did not admonish the Commonwealth's Attorney, we believe that the court's initial response to Burns' objection, i.e., "Hold on, Mr. Ebert[,]" was tantamount to an admonishment, which the jury heard. An "admonition of [a] trial court in the presence of [a] jury [makes] it known to the jury that the court [is] not satisfied as to the propriety of [an] argument." Clanton v. Commonwealth, 223 Va. 41, 54, 286 S.E.2d 172, 179 (1982). Thus, we conclude that Burns' rights were not "indelibly prejudiced." LeVasseur, 225 Va. at 589, 304 S.E.2d at 657.

### 3. MENTAL EVALUATION PRIOR TO PENALTY PHASE

Prior to the commencing the penalty phase of the trial, Burns moved for an evaluation pursuant to Code § 19.2-300. The circuit court denied the motion on the basis that an evaluation under that section is to guide the trial judge,

_____

Attorney.

55

not the jury. The court advised Burns that he could renew his motion at the proper time.

In pertinent part, Code § 19.2-300 provides, that, when any person is convicted for

> any criminal offense which indicates sexual abnormality, the trial judge . . . shall upon application of the attorney for the Commonwealth, the defendant, or counsel for defendant . . . defer sentence until the report of a mental examination conducted as provided in § 19.2-301 of the defendant can be secured to guide the judge in determining what disposition shall be made of the defendant.

Although Burns acknowledges that this statute provides for a mental evaluation to "guide the judge," he claims that such an evaluation is equally valuable to a jury when it is deciding the sentence for a capital murder conviction. However, his argument overlooks the plain language of the statute. This provision authorizes a mental evaluation for the purpose of guiding the trial judge, not the jury.

Furthermore, Burns renewed his motion for an evaluation under Code § 19.2-300 after the jury returned its sentencing verdicts, and the court granted it. Thus, Burns received all that he was entitled to under that statute. Accordingly, we will reject his claim.

### 4. PENALTY PHASE JURY INSTRUCTIONS

Before the jury commenced its deliberations during the penalty phase of the trial, the court instructed the jurors

56

that "[t]he words 'imprisonment for life' mean imprisonment for life without possibility of parole." In addition to this instruction, the court stressed to the jury that imprisonment for life does mean life without parole. Nevertheless, Burns now complains because the circuit court refused his proposed Instruction A, which instructed the jury that it could "consider as a possible mitigating factor that a sentence of life in prison means that the defendant will never be eligible for parole[,]" and his proposed Instruction C, which instructed the jury that, in determining the question of future dangerousness, it "may consider the fact that if you set the defendant's punishment at life imprisonment, he will never be eligible for parole."

We conclude that the circuit court properly rejected these instructions. Since the jury was instructed that imprisonment for life means life without the possibility of parole, both of Burns' proposed instructions were repetitious. See Gray, 233 Va. at 351, 356 S.E.2d at 178. Furthermore, we have consistently held that a defendant convicted of capital murder is not entitled to a jury instruction that emphasizes a particular mitigating factor. See e.g. George v. Commonwealth, 242 Va. 264, 283, 411 S.E.2d 12, 23 (1991), cert. denied, 503 U.S. 973 (1992); Gray, 233

Va. at 351, 356 S.E.2d at 178; LeVasseur, 225 Va. at 595, 304 S.E.2d at 661.[16]

### D. STATUTORY REVIEW

### 1. PASSION, PREJUDICE, AND PROPORTIONALITY

Pursuant to Code § 17.1-313(C)(1), we must determine whether the death sentence in this case was imposed under the influence of passion, prejudice, or other arbitrary factors. Upon careful review of the record, we find no evidence that any such factor was present or influenced either the jury's or the circuit court's sentencing decision.

However, Burns contends that his sentence of death was imposed under the influence of passion and prejudice because the Virginia death penalty statute is unconstitutional; he was not allowed to introduce evidence from prison officials to rebut the Commonwealth's closing argument that, if Burns receives life imprisonment, he would pose a continuing danger

------

[16] The court, sua sponte, asked the parties to address the verdict form utilized during the penalty phase of Burns' trial in light of our decision in Atkins v. Commonwealth, 257 Va. 160, 179, 510 S.E.2d 445, 457 (1999). Upon considering the parties' letter briefs, we conclude that any question concerning the verdict form in this case is procedurally defaulted because Burns neither raised the issue in the circuit court nor assigned it as error before this Court. See Rule 5:25; Orbe v. Commonwealth, 258 Va. 390, 403 n.13, 519 S.E.2d 808, 816 n.13 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1970 (2000).

to the prison staff and could escape from prison;[17] and the

Commonwealth's Attorney referred to Burns as an "animal" and

argued to the jury that their decision "will send a message."

We do not believe that any of these factors created an

atmosphere of passion or prejudice that influenced the

sentencing decision.

## 2. PROPORTIONALITY REVIEW

Code § 17.1-313(C)(2) requires us to determine whether

the sentence of death in this case is "excessive or

disproportionate to the penalty imposed in similar cases,

considering both the crime and the defendant."  Pursuant to

Code § 17.1-313(E), we have accumulated the records of all

capital murder cases reviewed by this Court.  The records

include not only those capital murder cases in which the

death penalty was imposed, but also those cases in which the

trial court or jury imposed a life sentence and the defendant

---

[17] This argument by the Commonwealth occurred during its rebuttal closing argument at the end of the penalty phase. At that time, Burns did not object to the argument.  However, after the court explained the verdict forms to the jury and the jury retired to deliberate, Burns moved for a mistrial on the basis that the Commonwealth's argument was precisely the kind of argument that he sought to rebut with his evidence concerning the security features of a maximum security prison and the nature of an inmate's life incarcerated in such a facility.  Clearly, this motion for a mistrial, unlike the first one, came too late.  See Reid, 217 Va. at 774, 232 S.E.2d at 781.  However, we express no opinion regarding the question whether Burns should have been allowed to introduce

petitioned this Court for an appeal.  Whitley v.

Commonwealth, 223 Va. 66, 81, 286 S.E.2d 162, 171, cert.

denied, 459 U.S. 882 (1982).  In complying with the statutory

directive to compare this case with "similar cases," we have

specifically focused on cases in which a person was murdered

during the commission of rape and/or forcible sodomy, and the

death penalty was imposed upon both the future dangerousness

and vileness predicates.  See, e.g., Cherrix, 257 Va. 292,

513 S.E.2d 642; Pruett v. Commonwealth, 232 Va. 266, 351

S.E.2d 1 (1986), cert. denied, 482 U.S. 931 (1987); Coleman

v. Commonwealth, 226 Va. 31, 307 S.E.2d 864 (1983), cert.

denied, 465 U.S. 1109 (1984); Mason v. Commonwealth, 219 Va.

1091, 254 S.E.2d 116, cert. denied, 444 U.S. 919 (1979);

Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135 (1978),

cert. denied, 441 U.S. 967 (1979).

We have also considered cases in which defendants

received life sentences, rather than the death penalty, for

capital murder during the commission of rape.  See, e.g.,

Horne v. Commonwealth, 230 Va. 512, 339 S.E.2d 186 (1986);

Keil v. Commonwealth, 222 Va. 99, 278 S.E.2d 826 (1981).

"However, our proportionality analysis encompasses all

capital murder cases presented to this Court for review and

---

that evidence to rebut the Commonwealth's argument if he had
made a timely objection.

60

is not limited" to these selected cases.  Overton v.

Commonwealth, 260 Va. 599, 605-06, ____ S.E.2d ____, ____

(2000) (citing Boggs v. Commonwealth, 229 Va. 501, 522, 331

S.E.2d 407, 422 (1985), cert. denied, 475 U.S. 1031 (1986)).

Our proportionality review also does not require that a given

capital murder case "equal in horror the worst possible

scenarios yet encountered."  Turner v. Commonwealth, 234 Va.

543, 556, 364 S.E.2d 483, 490, cert. denied, 486 U.S. 1017

(1988).

The defendant has argued that the sentence of death in

his case is disproportionate because of his borderline range

of intellectual functioning,[18] the physical and sexual abuse

that he suffered as a child, his incompetence to stand trial

at one time, his continued need for medications during the

trial, and his symptoms of anxiety and depression.  Burns,

however, fails to address the fact that he broke into and

entered the home of his elderly mother-in-law, raped and

sodomized her, and killed her by breaking her ribs in 24

places and rupturing her heart.  He also wants this Court to

ignore his lengthy criminal record and his repeated attacks

on Buckley.  Finally, we have approved the imposition of the

death penalty for a defendant with a significantly lower IQ

than that of Burns.  See Atkins v. Commonwealth, 260 Va. 375, 387-89, 534 S.E.2d 312, 319-21 (2000) (defendant had IQ of 59).  Thus, we do not find that any of the factors identified by Burns, when considered in light of his prior criminal history and the circumstances of this offense, distinguish him from other defendants who have received the death penalty.

Accordingly, based on our review of this case and "similar cases," we conclude that Burns' sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to the defendant's murder of Tersey Elizabeth Cooley.

III.  CONCLUSION

For the reasons stated, we find no error either in the judgments of the circuit court or in the imposition of the death penalty.  We also see no reason to commute the sentence of death.  Therefore, we will affirm the judgments of the circuit court.

Record No. 001879 — Affirmed.
Record No. 001880 — Affirmed.

JUSTICE KOONTZ, concurring in part and dissenting in part.

_____

[18] Dr. Cathy Williams-Sledge administered an intellectual test to Burns.  The results showed that he has a verbal IQ of 73, a performance IQ of 86, and a full-scale IQ of 77.

62

I respectfully dissent from that part of the majority opinion in this case concluding that the trial court did not err in refusing to order a competency evaluation of William Joseph Burns upon motion of his counsel during his trial for the capital murder of Tersey Elizabeth Cooley and other related felony crimes. I concur in all respects with the remainder of that opinion.

Beyond question, the conviction of a legally incompetent defendant violates that defendant's constitutional right to a fair trial. Drope v. Missouri, 420 U.S. 162, 171-72 (1975). In that regard, the issue in the present case does not involve an insanity defense which would concern Burns' mental state at the time these crimes were committed. Nor does the issue involve a final determination that Burns was, or was not, incompetent to stand trial at some point during this trial. Rather, the narrow issue is whether, under the facts of this particular case, Burns was improperly denied a competency evaluation pursuant to Code § 19.2-169.1(A) so as to ensure that he received a fair trial. See Drope at 181-82 (due process violated when trial court failed to make further inquiry into defendant's competency during trial).

In pertinent part, Code § 19.2-169.1(A) provides that: "If, at any time . . . before the end of trial, the court finds, upon hearing evidence or representations of counsel

for the defendant . . . that <u>there is probable cause</u> to believe that the defendant lacks substantial capacity to . . . assist his attorney in his own defense, <u>the court shall order</u> that a competency evaluation be performed." (Emphasis added). The probable cause standard in this statute is the familiar objective one requiring less than a preponderance of the evidence. Thus, where the circumstances of a particular case would reasonably cause doubt with respect to the defendant's substantial capacity to assist his attorney in his own defense, this statute mandates, as is constitutionally required, that the trial judge order an evaluation of the defendant's competency. This statute does not give the trial judge the discretion as to whether to order that evaluation. Accordingly, our review of the trial judge's denial of the motion by Burns' counsel for a competency evaluation pursuant to this statute involves consideration of the objective circumstances known to the trial judge at the time of his ruling, and not the trial judge's subjective beliefs regarding Burns' competency.

Although reflected only in a footnote in the majority opinion, it is significant that prior to Burns' trial the trial judge had found him incompetent to stand trial, and that only after approximately four months of inpatient care had the trial judge found that Burns' competency had been

restored.  However, Dr. William J. Stejskal, a court-appointed mental health expert, had opined in his report to the trial court that Burns' capacity to assist in his own defense was only "marginally intact," and that Burns would require appropriate antidepressant and anxiety medication under "continuing psychiatric care with respect to the management of the medications."  Burns was receiving these medications, prescribed by a physician, while in jail so that his capacity to assist in his own defense could be maintained.  Nevertheless, on the first day of trial it became necessary for the trial court to recess so that medication could be administered to Burns.  Then on the next day of trial, Burns became "visibly upset" while a tape of his statement to police was played for the jury.  Again the trial court recessed, questioned Burns, and heard evidence from the jail nurse that Burns was receiving the prescribed medications.

During the trial judge's questioning of Burns, he gave answers that the court reporter noted in some instances as "inaudible" and in others as "unintelligible."  As indicated in the majority opinion, the trial judge dismissed this distinction in Burns' answers, finding that Burns' "responses were inaudible, not necessarily nonsensical.  The bits and pieces that I could understand were responsive to my

questions. All told, though, they were simply inaudible." In contrast to this conclusion, admittedly based on only "bits and pieces" that could be understood, Burns' counsel asserted that "quite clearly, [Burns] is not thinking rationally at this time, and his statements are incomprehensible. I am sitting right next to him."

In denying the motion for a competency evaluation, the trial judge expressed in detail his reasons for doing so. Those reasons are related in the majority opinion and need not be repeated here. It is apparent that the trial judge concluded that because Burns was receiving medication he was competent, that he was probably "malingering" or "acting," and that playing the tape of his statement to the police was understandably "upsetting" to him. In short, the trial judge simply did not believe that Burns lacked substantial capacity to assist his attorney in his own defense. The trial judge may have been right in his conclusions regarding Burns' competency. No appellate court will ever know for sure, however.

In any event, the trial judge was not called upon under the proper application of Code § 19.2-169.1(A) to determine Burns' competency or to deny the requested evaluation upon a subjective belief that Burns was "acting" incompetent. Rather, the trial judge was called upon to determine

66

objectively whether from the undisputed facts there existed probable cause to believe that Burns lacked the requisite capacity to assist his attorney in his own defense. Upon a showing of that probable cause, the trial judge was statutorily mandated to order the requested competency evaluation.

In my view, the conclusion that such probable cause was established is compelled by the undisputed facts in this case. Burns was known to be only "marginally" competent to stand trial when the trial began. His competency during trial depended entirely on the continuing effectiveness of the prescribed medications and not merely that Burns received them. On at least one occasion it became necessary to recess the trial proceedings so that Burns could be given additional medication. On another occasion, Burns became "visibly upset," another recess was required, and at that time he gave "unintelligible" answers to some of the trial judge's questions. Moreover, Burns' counsel advised the trial court that Burns was not thinking "rationally" and that Burns' statements were "incomprehensible" to him. Surely, these circumstances created a reasonable question whether the prescribed medications were continuing to be effective so that Burns could maintain substantial capacity to assist his attorney in his own defense. Accordingly, probable cause was

67

established on the issue of Burns' competency and it was error for the trial court to deny the motion for a competency evaluation as mandated by Code § 19.2-196.1(A).

For these reasons and because the error in this case denied Burns his right to a fair trial, I would reverse his conviction and remand this case for a new trial.