COURT OF APPEALS OF VIRGINIA

Present: Judges Causey, Chaney and Callins
Argued at Hampton, Virginia


IZIAHA TAWON TISDALE

                                           MEMORANDUM OPINION* BY
v.        Record No. 0934-23-1              JUDGE VERNIDA R. CHANEY
                                           FEBRUARY 4, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Matthew Hoffman, Judge

(Joshua A. Goff; Goff Voltin, PLLC, on brief), for appellant.
Appellant submitting on brief.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Iziaha Tawon Tisdale of attempted unlawful wounding, maliciously

shooting into an occupied vehicle, and willfully tampering with a prison fire suppression system.

On appeal, Tisdale contends the trial court erred by denying his motion to suppress the

out-of-court and in-court identifications made by two witnesses on due process grounds. He also

challenges the sufficiency of the evidence supporting his convictions. For the following reasons,

we affirm the trial court's judgment.

                            BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

UNPUBLISHED

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."
*Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Around 11:30 a.m. on February 7, 2022, Hussein Mutar, a food delivery driver, was delivering food to Colony Square Apartments. When he finished, he drove eastbound to an intersection across from an auto repair shop and prepared to make a left U-turn into the westbound lane. As he yielded to oncoming traffic, a Ford Focus appeared in the right lane next to Mutar's car and stopped about 25 feet ahead of him. The Ford's driver got out of the vehicle, aimed a firearm at Mutar, and shot three times before returning to his car and departing. One bullet struck Mutar's front passenger-side tire, and the others pierced the front passenger side of his vehicle. Mutar briefly attempted to follow the gunman in his car but, upon realizing that one of his tires was pierced during the shooting, turned around and drove to A&E Auto Repair Shop for assistance. Mutar testified that his tire was flat and there was something wrong with the engine. Several witnesses at the repair shop saw the incident and called police. At 11:41 a.m., Newport News Police Officer Ryan Everage arrived at the shop and interviewed the witnesses. Mutar described the shooting and said the gunman was a 30-year-old "black male" wearing a "black or blue" "shirt or jacket" and that he exited a "black or gray vehicle while on Warwick Boulevard."

Robert Pelfrey, an employee at the repair shop, testified that when the shooting occurred, he was driving in the opposite direction toward the intersection in the westbound lane. There was a young "African-American male," around "21 or 22," standing in a crosswalk in front of the auto repair shop, slightly behind Pelfrey's vehicle on the right passenger side. When Pelfrey stopped at the intersection and prepared to turn right into the repair shop parking lot, a gray Ford Focus driving in the eastbound lane entered the intersection. The Ford's driver's side window was down, and Pelfrey could see "a black gentleman" inside. Pelfrey heard at least three gunshots erupt and saw flashes coming from the Ford's driver's side window. Assuming that the driver was shooting either

- 2 -

at him or the pedestrian behind his vehicle, Pelfrey drove quickly to the repair shop and sheltered inside. Pelfrey reported that the pedestrian ran away during the shooting but returned to the shop shortly before police arrived to inquire whether the shooter had been shooting at him. When Pelfrey reassured the pedestrian that "the cops [were] on the way," the pedestrian said "nah, nah, nah don't worry about it" and fled the scene. Pelfrey described the shooter's firearm as "primarily black with a little bit of silver or . . . gray." Pelfrey also inspected Mutar's car and confirmed that it contained "three bullet holes in the passenger side front fender."

Pelfrey also stated that Kevin Weeks, a patron who often "hangs out" at the repair shop, witnessed the incident and spoke to the police once they arrived. Several other witnesses spoke to the police and reported that they saw a pedestrian near the repair shop run away during the shooting. At least one witness said the shooter was wearing a "black hood" and a "black COVID mask that was covering the lower half of his nose." None of the witnesses described the shooter's height, weight, or other physical characteristics.

After being on the scene and speaking to bystanders for approximately 14 minutes, police saw a Ford Focus matching the description of the shooter's vehicle drive past the crime scene. Officer Everage and another officer, Officer Green, entered their patrol cars and followed the Ford to the E-Mart shopping center, near the Colony Square Apartments. Twenty-three-year-old Tisdale, the Ford's driver, exited the vehicle and walked toward a store wearing a camouflage jacket and blue jeans. When Officer Green activated his patrol car's emergency siren, Tisdale looked at the officers and "ran towards the entrance of the Aqueduct Apartments, turned around and then went towards and into Colony Square Apartments." During a brief pursuit, Officer Green saw Tisdale remove a firearm from his "waistband" before disappearing around a corner. As he turned the corner, Officer Everage saw Tisdale throw the firearm towards the fence line and ordered him to surrender. In response, Tisdale laid down on the ground, and the officers handcuffed him. Police

collected the firearm Tisdale discarded, a "Sky Industry Model CPX-2 caliber 9mm Luger pistol" with a "silver receiver" and a black handle. The gun had a single bullet loaded in its chamber, but its magazine was missing. Officer Everage noticed the gun felt "warm" even though the weather was "chilly." Police found three bullet casings in the intersection where the shooting occurred. Subsequent forensic testing established that the firearm thrown by Tisdale had fired the bullet casings found at the crime scene.

About "five minutes" after handcuffing Tisdale, police conducted a "show up" identification to confirm whether he was the shooter. A police sergeant placed Weeks and Pelfrey in separate police cars and transported them to the area where Tisdale was in handcuffs, "surrounded by police officers" and their patrol cars. The sergeant questioned Weeks and Pelfrey and asked whether the person in handcuffs was the suspect they previously described. After Weeks and Pelfrey both "made positive identifications," Officer Everage drove Mutar to the show up and asked him to confirm whether Tisdale was the shooter. In response, Mutar said that he was "70 percent" certain that Tisdale was the gunman. After conducting the identification and confirming that Tisdale previously had been convicted of a non-violent felony, police arrested Tisdale for attempted malicious wounding, maliciously shooting into an occupied vehicle, use of a firearm in the commission of attempted malicious wounding, and possession of a firearm after previously being convicted of a non-violent felony.

On February 11, 2022, while in jail pending trial, Tisdale asked a deputy to approach his cell. Tisdale was "in [a] cell by himself" because he was "on sanction" for misbehavior. The cell contained a blanket, toilet, as well as a fire "sprinkler" on the wall. When deputies did not immediately respond to Tisdale's request, he became upset and "threatened to flood his cell." Deputy Tyche Raynor approached the window of Tisdale's cell and saw him grab a blanket and move toward the toilet inside the cell. Suspecting that Tisdale was attempting to flood his cell with

water by "stick[ing] the blanket in the toilet," Raynor went to shut off the water supply. When Raynor returned, 2-3 minutes later, he noticed that the fire sprinkler in Tisdale's cell was damaged, and water was leaking from it. Based on that evidence, the Commonwealth charged Tisdale with willfully tampering with a prison fire suppression system.

Before trial, Tisdale moved *pro se* to suppress Weeks's and Pelfrey's out-of-court identifications on due process grounds and to prohibit them from identifying Tisdale in court as the shooter, arguing that the identifications were the product of an unduly suggestive identification. At the hearing, the Commonwealth's sole witness, Officer Everage, acknowledged that Mutar, Pelfrey, and Weeks provided only vague descriptions of the gunman's age, race, and clothing. He also confirmed that at least one witness reported that the gunman was wearing a mask during the shooting. Everage testified that police did not separate Weeks and Pelfrey during the identification. Everage was not present at the show up, and maintained that he did not know what the officers said to the witnesses during the show up, including whether the officers warned them that Tisdale may not be the shooter. Everage admitted that he had limited involvement in the identification as a whole.

Following argument, the trial court held that, while a show up is suggestive "in its nature," it was not "unduly" so in this instance. Accordingly, the trial court denied Tisdale's motion to suppress.

At Tisdale's jury trial for attempted malicious wounding, maliciously shooting into an occupied vehicle, willfully tampering with a prison fire suppression system, and use of a firearm in the commission of attempted malicious wounding,[1] Weeks did not testify. Mutar identified Tisdale in court and testified that he was "70 percent" certain that he was the shooter because Tisdale was

---

[1] Pursuant to the parties' agreement, the trial court severed Tisdale's related charge for possession of a firearm after being convicted of a non-violent felony for a separate trial.

the "same height" and "skin color" as the shooter and had been driving the "same car." Mutar maintained that the gunman aimed directly at him during the shooting, emphasizing that the shooter "was looking at [Mutar]" in "[his] eyes" when he shot Mutar's vehicle.

Pelfrey identified Tisdale in court and identified him as the shooter. He also confirmed that he previously identified Tisdale as the shooter during the show up identification. During his testimony, the prosecutor showed Pelfrey a photograph depicting the Ford Tisdale had been driving before his arrest; Pelfrey identified it as the shooter's vehicle.

During their testimony, Pelfrey and Mutar both confirmed that they had a limited opportunity to view the gunman because the shooting occurred quickly. Mutar acknowledged that he was in distress during the incident, and Pelfrey agreed that he was focused on "[s]taying alive," not identifying the shooter, during the shooting.

Officer Everage confirmed that during his investigation, several witnesses reported that they saw a pedestrian "walking on the sidewalk" in front of the repair shop when the shooting occurred and that the pedestrian "ran after gunshots were fired." He testified that he was unable to interview the pedestrian because he fled before police arrived. Everage opined that it would be unusual for someone to return to a crime scene after receiving gunfire, as Pelfrey had described. Officer Green also testified that armed suspects who are convicted felons often flee from police because "they're not supposed to have a gun," not necessarily because they have committed another offense.

After the Commonwealth's case-in-chief, Tisdale moved to strike the attempted malicious wounding and maliciously shooting into an occupied vehicle charges, arguing that the evidence failed to prove that he was the shooter and that he intended to shoot Mutar. The trial court denied the motion.

Testifying in his defense, Tisdale denied[2] involvement in the shooting or that he had possessed a firearm. He testified that before his arrest, he was driving his girlfriend's Ford Focus to the store to buy groceries. When he saw police following him, he became frightened because he was a "black male" in a "high-crime neighborhood." Tisdale acknowledged that he ran from the officers but claimed he did so solely because he feared for his safety. He denied having a firearm on him at any time during the interaction, and consequently denied discarding the firearm the officers found.

At the conclusion of the evidence, Tisdale renewed his motion to strike on the same grounds, which the trial court denied. Before closing arguments, the jury received instructions specifying the elements of the charged offenses and their lesser-included offenses. Following closing arguments, the jury convicted Tisdale of the lesser-included offense of attempted unlawful wounding on the attempted malicious wounding charge, maliciously shooting into an occupied vehicle, and willfully tampering with a prison fire suppression system.[3]

On appeal, Tisdale contends the evidence was insufficient to support his convictions and that the trial court erred in denying his motion to suppress on due process grounds.

ANALYSIS

I. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does

_____

[2] During his testimony, Tisdale acknowledged that he previously had been convicted of a felony and a misdemeanor crime of moral turpitude.

[3] The jury also convicted Tisdale of use of a firearm in the commission of attempted malicious wounding. The trial court set aside that conviction on the parties' agreed motion.

not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Tisdale argues that the evidence was insufficient to support his convictions for attempted unlawful wounding, maliciously shooting into an occupied vehicle, and willfully tampering with a prison fire suppression system.[4] With respect to the attempted unlawful wounding and maliciously shooting into an occupied vehicle, Tisdale contends that the evidence was insufficient to support his convictions because it failed to exclude the possibility that another individual in the area was the shooter. He argues that someone else could have fired the gun, and he "just happened to drive down [the road] afterwards in a Ford Focus similar in appearance" to the shooter's. He emphasizes that Mutar and Pelfrey provided "vague" descriptions of the gunman and that Mutar acknowledged he was only "70 percent" certain whether Tisdale was the shooter.

Next, he argues that the evidence was insufficient to support his attempted unlawful wounding conviction because it failed to demonstrate that Mutar, and not the pedestrian, was his

---

[4] Tisdale's brief does not include any independent argument to support his contention that the trial court erred in denying his motion to strike the charge for willfully tampering with a fire suppression system. Unbriefed assignments of error do not merit appellate consideration and constitute grounds for procedural default under Rule 5A:20. *Burns v. Commonwealth*, 261 Va. 307, 318 (2001). Thus, to the extent Tisdale's assignment of error challenges this conviction, his arguments "are waived, and we will not consider them on appeal." *Id.* (quoting *Kasi v. Commonwealth*, 256 Va. 407, 413 (1998)).

intended target. He maintains that his criminal intent could not be transferred to another victim for an attempt crime. We address the arguments in turn.

## A. *Identity*

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *See Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999) ("Any element of a crime may be proved by circumstantial evidence."). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "[C]ircumstantial evidence is not viewed in isolation." *Id.* (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Pijor v. Commonwealth*, 294 Va. 502, 512-13 (2017) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). Moreover, "[b]y finding the defendant guilty, . . . the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *James v. Commonwealth*, 53 Va. App. 671, 681 (2009) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). That conclusion "is itself a 'question of fact,' subject to deferential appellate review." *Id.* (quoting *Haskins*, 44 Va. App. at 9).

At trial, Mutar testified that a gunman driving a Ford Focus stopped ahead of him at an intersection, exited the car aiming a firearm in his direction, and shot at Mutar's vehicle repeatedly.

Mutar told police and later testified that he was "70 percent" certain that Tisdale was the shooter. *See Robinson v. Commonwealth*, 186 Va. 992, 994 (1947) (holding that a conviction for malicious assault may "rest upon [an alleged victim's] uncorroborated testimony"). Although Mutar acknowledged that he was not completely sure that Tisdale was the gunman, his identification remains probative of Tisdale's identity as the perpetrator.

In addition, the circumstantial evidence—including Tisdale's possession of the firearm and vehicle used in the shooting shortly after the incident and his subsequent flight from police—could lead a reasonable fact finder to infer guilt. It is well-settled that evidence that a defendant had "the time and opportunity to commit the crime" is probative of his identity as the perpetrator. *Rams v. Commonwealth*, 70 Va. App. 12, 40 (2019). Moreover, "it is . . . universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and *related conduct* are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) (emphasis added) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991)). The record shows that about 20 minutes after the shooting, police found Tisdale driving a Ford Focus matching the description of the gunman's vehicle. When officers followed Tisdale and signaled their presence, Tisdale fled. During his flight from police, Tisdale discarded a firearm matching the description of the shooter's gun. Forensic testing established that the gun fired the three bullet cartridge casings found at the crime scene. Collectively, that evidence permitted the jury to conclude that Tisdale shot at Mutar and then ran from police and attempted to discard the weapon he used shortly after the shooting.

Next, "[t]he trier of fact is not required to accept a party's evidence in its entirety, but is free to believe or disbelieve, in whole or in part, the testimony of any witness." *English v. Commonwealth*, 43 Va. App. 370, 371 (2004) (citation omitted). Indeed, we have held that where

other evidence supports a defendant's guilt, the fact finder, as sole judge of witness credibility, may "disbelieve the defendant who professes his innocence at trial" and conclude that his testimony is false. *Camann v. Commonwealth*, 79 Va. App. 427, 444 (2024) (en banc). Although Tisdale denied involvement in the shooting or possession of the gunman's weapon, the jury was not required to accept that testimony as true. The record demonstrates that Tisdale's testimony was flatly contradicted by the Commonwealth's evidence. He claimed, for example, that he did not even possess the firearm; however, Everage saw Tisdale throw the firearm toward a fence shortly before taking him into custody. Given that impeachment of Tisdale's testimony, Mutar's identification of Tisdale as the shooter, and the above circumstantial evidence demonstrating Tisdale's opportunity to commit the offenses and effort to conceal his involvement, the jury could rationally reject Tisdale's denial that he was the gunman as false.

Nevertheless, Tisdale maintains that the jury should have accepted his proffered hypothesis of innocence that an unknown third party, not Tisdale, might have shot at Mutar. Tisdale's argument overlooks the principle that "[t]he hypotheses which must be thus excluded are those which flow from the evidence itself, and not from the imaginations of" the defense. *Cook v. Commonwealth*, 226 Va. 427, 433 (1983). Nothing at trial suggested that a third party shot at Mutar. Rather, as noted, Mutar's identification and the circumstantial evidence including Tisdale's possession of the instrumentalities of the shooting and attempts to conceal his involvement further support the jury's finding that Tisdale was the shooter.

B. *Intent*

Tisdale also argues that the evidence was insufficient to support his convictions for attempted unlawful wounding and maliciously shooting into an occupied vehicle because it failed to prove he intended to shoot Mutar. Tisdale acknowledges that Mutar testified that Tisdale faced him and shot at his vehicle, but he contends that Pelfrey provided a conflicting account of the shooting

that supported his proffered hypothesis of innocence.  Specifically, Tisdale emphasizes that Pelfrey testified that he believed either he or the unidentified pedestrian behind Pelfrey was Tisdale's intended target during the shooting, not Mutar.  Thus, Tisdale argues that the evidence failed to prove that Mutar was his intended target.  That deficiency in the evidence, Tisdale argues, requires reversal of his attempted unlawful wounding conviction because the transferred intent doctrine does not apply to attempt crimes.  *See Fary v. Commonwealth*, 77 Va. App. 331, 346 (2023) (en banc) ("[T]he transferred intent doctrine is inapplicable to an attempted crime." (citing *Crawley v. Commonwealth*, 25 Va. App. 768, 773-74 (1997))).

"Intent is the purpose formed in a person's mind at the time an act is committed," which "may, and often must, be inferred from the facts and circumstances of the case, including the actions and statements of the accused." *Johnson v. Commonwealth*, 53 Va. App. 79, 100 (2008) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 519 (1998)).  "The finder of fact may infer that a 'person intends the natural and probable consequences of his or her acts.'" *Id.* (quoting *Velasquez v. Commonwealth*, 276 Va. 326, 330 (2008)).  Whether a defendant possessed the requisite intent "normally rests with the finder of fact." *Id.* at 101 (quoting *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977)).

Mutar testified unequivocally that the gunman shot at his vehicle three times after meeting Mutar's gaze and aiming a gun in his direction.  Consistent with Mutar's testimony, Pelfrey found three "bullet holes" in Mutar's car immediately after the shooting and exactly three cartridge cases at the scene.  Although Pelfrey testified that he thought that either he or the pedestrian behind him was the shooter's intended target, the physical evidence contradicts that assertion.  At trial, the Commonwealth introduced a map depicting the intersection where the shooting occurred and the locations of the shooter, Mutar, Pelfrey, and the pedestrian.  According to the map, the shooter would have had to turn 90 degrees away from Mutar to shoot at either Pelfrey or the pedestrian.

- 12 -

Pelfrey and Mutar both testified that the gunman fired three times, police found three cartridge cases, and Mutar's vehicle had three bullet holes. Considering the evidence, the jury could reasonably infer that Tisdale intentionally shot at Mutar, not Pelfrey or the pedestrian.

## II. Suppression of Identification

Tisdale argues that trial court violated his right to due process by allowing the Commonwealth to introduce Weeks's and Pelfrey's out-of-court and in-court identifications of Tisdale as the shooter. He argues the identifications were the product of an unduly suggestive identification and inherently unreliable. Tisdale asserts that the show up identification police conducted in this case was inherently suggestive because Tisdale was the sole suspect, in handcuffs, and surrounded by several officers and patrol cars when police asked Weeks and Pelfrey to identify him. Additionally, he emphasizes that the officers failed to "separate" Weeks and Pelfrey during the identification to prevent them from "influencing" each other, and none of the officers warned the witnesses that they did not know whether Tisdale was the culprit. Because we need not decide whether the circuit court erred by denying the motion to suppress Weeks and Pelfrey's identifications, we affirm Tisdale's convictions.

"The proper inquiry for constitutional harmless error is 'whether the [jury] *would have* returned the same verdict absent the error.'" *Commonwealth v. White*, 293 Va. 411, 421-22 (2017) (quoting *Washington v. Recuenco*, 548 U.S. 212, 221 (2006)); *see Chapman v. California*, 386 U.S. 18, 24 (1967) (holding that constitutional error is harmless if the appellate court is "able to declare a belief that it was harmless beyond a reasonable doubt"). In conducting its harmless error analysis, an appellate court must consider "the potential effect of the [erroneously admitted or] excluded evidence in light of all the evidence" before the jury. *Haas v. Commonwealth*, 299 Va. 465, 467 (2021) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016)) (considering non-constitutional error); *see Maynard v. Commonwealth*, 11 Va. App. 437, 448 (1990) (en

- 13 -

banc) (assuming that a constitutional error had the most damaging effect possible). "[W]hether such an error is harmless in a particular case depends upon a host of factors," including the "importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points . . . and . . . the overall strength of the prosecution's case." *Crawford v. Commonwealth*, 281 Va. 84, 101 (2011) (second through fifth alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

We have held that erroneously admitted evidence favorable to the Commonwealth may be harmless beyond a reasonable doubt if the "overall strength of the Commonwealth's case," independent of the challenged evidence, is "overwhelming" and the "'tainted evidence'" has limited "'importance . . . in the prosecution's case.'" *Id.* at 102 (quoting *Van Arsdall*, 475 U.S. at 684). *See also Commonwealth v. Kilpatrick*, 301 Va. 214, 217 (2022) (finding harmless error where other evidence of guilt was "so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict").

As an initial matter, Weeks did not testify at Tisdale's trial, and Tisdale did not seek to exclude Mutar's identification of him as the shooter. Thus, for purposes of our harmless error analysis, we need only consider the effect of Pelfrey's identification. Setting aside that identification, the evidence established that about 20 minutes after the shooting, police found Tisdale driving a Ford Focus matching Mutar's and Pelfrey's description of the shooter's vehicle. When police followed Tisdale and tried to stop him, he fled and discarded a firearm that subsequent forensic analysis determined was used in the shooting. Moreover, Mutar was "70 percent" certain that Tisdale was the shooter. In addition, Tisdale's testimony could rationally be rejected by the jury and considered as further evidence of guilt. In sum, Mutar's credible testimony, Tisdale's incredible testimony, and the circumstantial evidence proving that Tisdale possessed the gunman's

vehicle and weapon shortly after the shooting provided overwhelming evidence of Tisdale's guilt. This cumulative evidence renders any error in admitting Pelfrey's identification "insignificant by comparison such that the error could not have affected the verdict." *Id.* at 217.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*